Abraham Bates (12440)
**WASATCH ADVOCATES LLC**
4525 Wasatch Blvd. Ste 300
Salt Lake City, Utah 84124
Telephone: (801) 662-0077
Facsimile: (801) 662-0082
abe@slclawfirm.com

Attorney for Plaintiffs

## IN THE FIFTH JUDICIAL DISTRICT COURT
## WASHINGTON COUNTY, STATE OF UTAH

| | |
|---|---|
| LEE A. TERRY and AMY TERRY <br><br> Plaintiffs, <br><br> vs. <br><br> INDYMAC MORTGAGE SERVICES d/b/a INDYMAC BANK, F.S.B or ONEWEST BANK F.S.B.; ETITLE INSURANCE AGENCY; and DOEs #1 through #10. <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 100503567 <br><br> Judge: Beacham |

Plaintiffs Lee A. Terry and Amy Terry, by and through their attorney, Abraham Bates, file

this Complaint and allege the following:

### PARTIES

1. Plaintiffs Lee A. Terry and Amy Terry, ("Plaintiffs") are residents of Washington County,

    state of Utah, and are the owners of the property located at 1630 East 2450 South, Unit 239,

    Saint George, Utah, 84790 (the "Property"), and the obligors on a promissory note (the

    "Note) secured by a mortgage deed of trust ("Trust Deed"). *See* Deed of Trust as attached

    Exhibit 1.

1

2. Defendant IndyMac Mortgage Services d/b/a IndyMac Bank F.S.B. or OneWest Bank F.S.B ("IndyMac") is the original lender named on the deed of trust recorded against the Property, recorded on April 2, 2008.

3. Defendant e-Title Insurance Agency ("e-Title") is the alleged Successor Trustee on the Foreclosing Trust Deed.

4. DOEs #1 through #10 are other unknown real parties in interest.

## JURISDICTION AND VENUE

5. Jurisdiction is proper pursuant to Utah Code Ann. § 78-3-4.

6. This suit is brought in the Fifth District Court, State of Utah, and venue is proper pursuant to Utah Code Ann. § 78-13-4(1), because the property at issue is located in Washington County, state of Utah.

## GENERAL ALLEGATIONS

1. On March 28, 2008 Plaintiffs signed the Note secured by the Trust Deed on the Property.

2. All payments on the Note were timely until the Plaintiffs fell on hard times as a result of the current housing and mortgage crises; Mr. and Mrs. Terry are self-employed and suffered a significant loss in income due to the housing crisis.

3. After exhausting all other options, the Plaintiffs were unable to pay on the Note and went into default on or about March of 2009.

4. After the Plaintiffs knew they would be unable to comply with the terms of the Note, and began seeking loan modification with IndyMac. *See* Loan Modification Notice from Indymac Bank as attached as Exhibit 2.

2

5.  After several months of correspondence, including repeated requests by IndyMac for documents the Plaintiffs had already provided, Plaintiffs were approved for a trial loan modification under HAMP. *See,* Trial Loan Acceptance Letter, attached as Exhibit 3.

6.  The trail loan modification began on December 1, 2009 with a payment of 1,221.52 due, with the same amount due on the first of the following two months. *Id.*

7.  IndyMac represented to the Plaintiffs throughout the loan modification process that they were eligible for loan modification.

8.  Plaintiffs were not informed that they had been denied loan modification and they were unaware of the foreclosure proceedings until a trustee's sale was scheduled. *See* Notice of Trustee's Sale as Attached Exhibit 4.

9.  On June 9, 2010 Plaintiffs received a letter informing them that if their financial situation remained the same, they would receive an offer for a permanent loan modification. *See* Hamp Application Complete Letter, attached as Exhibit 5.

10. On August 12, 2010 the home was re-scheduled for a trustee's sale.

11. The Trustee's Deed was not recorded until a week later. *See* Recorded Trustee's Deed, attached as Exhibit 6.

12. The Plaintiffs never received a notice of sale for this Amended Trustees Sale.

**CONGRESSIONAL RESPONSE TO NATIONAL FORECLOSURE CRISIS**

13. Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[1]

14. In April of this year, the Salt Lake Tribune published a front-page article declaring that Salt Lake is the "worst of the worst" in the growth of foreclosure related filings, largely because the housing crisis came to Utah late. *See* SLC #1 in Foreclosure Growth, attached as Exhibit 7.

15. Increased foreclosures have a detrimental effect on borrowers who are at serious risk of losing their homes. Foreclosures also have a negative impact on the surrounding neighborhoods that suffer decreased property values. In addition, municipalities lose tax revenue as a result of foreclosures.

16. On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 and amended it on February 17, 2009, with the American Recovery and Reinvestment Act of 2009 (together, the "Act"). 12 U.S.C. § 5201 *et seq.* (2009).

17. The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

18. The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3, *available at* URL http://cop.senate.gov/reports/library/report-100909-cop.cfm. (last visited April 13, 2010).

4

19. In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

20. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219.

21. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

22. The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C § 5220.

23. On February 18, 2009, pursuant to their authority under the Act, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program. One aspect of this program is known as the Home Affordable Modification Program ("HAMP").

24. HAMP is funded by the federal government primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

25. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive

$1,000.00 for each HAMP modification and an additional $500 for modification of yet to be delinquent loans which were in clear danger of imminent default.

26. When a servicer participates in HAMP it must execute a Servicer Participation Agreement ("SPA") with the federal government.

27. An SPA incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers.

28. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."

29. The Program Documentation requires Participating Servicers to evaluate *all loans* that are 60 or more days delinquent for HAMP modifications. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

## FIRST CAUSE OF ACTION
### Breach of Duty of Good Faith and Fair Dealing

30. Plaintiffs repeat and reincorporate the preceding paragraphs by reference.

31. IndyMac repeatedly stated, or implied, that the Plaintiffs would be considered for loan modification at an affordable interest rate.

32. IndyMac did not act in good faith by continuing to encourage the Plaintiffs to wait for a response on loan modification knew or should have known that they would be unable to provide better terms.

6

33. IndyMac participates in HAMP, which directs lenders to maximize assistance to homeowners, including loan modifications, to prevent foreclosure. The TARP guidelines (discussed above in paragraphs 13 through 29) give this court a guideline of IndyMac's duty of good faith to find the Plaintiffs a reasonable loan modification.

34. Plaintiffs relied, to their detriment; on the representation made by IndyMac that should wait for their loan modification to go through, when in fact IndyMac was in the process of foreclosing.

35. After representing to the Plaintiffs that they qualified for a 90 day trial loan modification, IndyMac was unwilling to negotiate a loan modification.

36. Plaintiffs relied, in good faith, on the representations made by IndyMac, only to be denied any loan modification in the end.

37. IndyMac has a duty to act in good faith, when reviewing the Plaintiffs' applications for loan modification, and should act in a way consistent with TARP law, to ensure that borrowers receive the best possible loan modification to avoid foreclosure.

38. The Plaintiffs suffered damages because they were rejected loan modification and were foreclosed despite representations that they would qualify for loan modification through HAMP.

39. IndyMac violated it duty of good faith when, as a direct result of their representations to the Plaintiffs, the Property was sold in a trustee's sale.

40. IndyMac/OneWest has a history of approving foreclosure without doing the appropriate due diligence. One OneWest employee has stated that no more than 30 seconds was spent

reviewing a foreclosure before signing off on it. *See* OneWest Bank Article, attached as Exhibit 8.

### SECOND CAUSE OF ACTION
### Negligent Misrepresentation

41. Plaintiffs repeat and reincorporate the preceding paragraphs by reference.

42. IndyMac has a pecuniary interest in the Property.

43. IndyMac is in a superior position to know the material facts concerning the Klekas' request for loan modification.

44. IndyMac carelessly or negligently made false representations, when they repeatedly represented that the Plaintiffs they would qualify for a loan modification under HAMP.

45. IndyMac knew or should have known that the Plaintiffs did not qualify for modification under HAMP, despite multiple representations encouraging and requesting documents for a HAMP loan modification application.

46. Representatives from IndyMac carelessly or negligently represented that the Plaintiffs would qualify for an affordable loan modification agreement if they applied under HAMP.

47. IndyMac represented on several occasions that the Plaintiffs HAMP loan modification was under review and that no sale was pending.

48. It was a direct result of the representations made by IndyMac, that the Plaintiffs could reduce their interest rate, either through HAMP or an internal loan modification program, that lead the Plaintiffs to remain in default and lead to the foreclosure.

49. Plaintiffs reasonably relied on the encouragement of IndyMac to apply for loan modification, because of their position as the more sophisticated party.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.      For damages and punitive damages pursuant to Defendant's violations of the duty of good faith and fair dealing.

2.      For damages pursuant to Defendant's negligent misrepresentations that they could receive a lower interest rate by reapply for loan modification.

3.      For reformation of Plaintiffs' mortgage loan contract and equitable injunctive and/or declaratory relief in the discretion of the Court.

4.      For additional damages and/or attorneys' fees and/or costs as allowed by contract, statute or court rule; and

5.      Such other relief as the Court deems just.

Dated this 13th day of October 2010.

Abraham Bates
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing COMPLAINT was served upon the following parties by CERTIFIED MAIL, postage prepaid, on the 13th day of October 2010, as follows:

| | |
|---|---|
| IndyMac Mortgage Services<br>a division of OneWest Bank, FSB<br>6900 Beatrice Drive<br>Kalamazoo, MI 49009 | |
| eTitle Insurance Agency L.L.C.<br>upon Kent W. Plott<br>3269 South Main, Suite 100<br>Salt Lake City, UT 84115 | |

_Abraham Bates_

Abraham Bates